*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
April 8, 2021

Plaintiff-Appellee,

v

No. 349597
St. Joseph Circuit Court
LC No. 17-021752-FC

ZACHARY MICHAEL PATTEN,

Defendant-Appellant.

Before: FORT HOOD, P.J., and GADOLA and LETICA, JJ.

PER CURIAM.

In this case involving the shooting death of Shane Richardson, defendant appeals by right his jury convictions of first-degree premeditated murder, MCL 750.316(1)(a); first-degree felony murder, MCL 750.316(1)(b); first-degree home invasion, MCL 750.110a(2); and carrying or possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to serve life without the possibility of parole for each of his murder convictions; 5 to 20 years' imprisonment for his home invasion conviction; and 2 years' imprisonment for his felony-firearm conviction. We affirm, but remand to the trial court to amend defendant's judgment of sentence.

## I. BASIC FACTS

Richardson was married to defendant's former wife, Kaleena Richardson. Defendant and Kaleena had three children together, and Kaleena was pregnant with her first child by Richardson. In July 2017, defendant was living with his girlfriend, Nichole Hart, Hart's two young children, and his oldest daughter, AP. Oscar Portillo was the father of Hart's two children.

On July 20, 2017, defendant came home from work and was agitated. At about 7:30 p.m., defendant broke a hole in the drywall of his bedroom and retrieved a handgun that he had hidden in the wall. He then drove Hart's car to the trailer park where he believed that Oscar lived. He drove around until he spotted Oscar's car. Oscar was standing with his sister, Graciela Portillo-

-1-

Esparza, on the porch of their mother's trailer. Defendant got out of his car, took aim at Oscar with his handgun, and fired. Defendant struck and killed Graciela.[1]

Defendant next drove to Kaleena's home, which was located in St. Joseph County, Michigan. Defendant knocked on Kaleena's door at about 10:00 p.m. that night. Kaleena, Richardson, and Kaleena's two youngest children were sitting on the couch together watching television. Defendant knocked on the door, Kaleena responded to the knock, and defendant demanded to see Kaleena's "f****** husband." Kaleena told him that that was not going to happen, shut the door, and locked it. Defendant then forced his way through the door. As Richardson moved toward the door, defendant fired a single shot at Richardson. The shot entered Richardson's neck and went through his spine. Richardson died from his injuries.

Defendant left Kaleena's home and fled to Indiana. Sometime between 11:00 p.m. and midnight, defendant stopped and purchased alcohol. Officers arrested him later that same night for driving under the influence after defendant crashed his car near an airport. Officers seized defendant's gun but released him after taking him to a hospital. The next day, the hospital discharged defendant and he turned himself in to Indiana police officers.

The prosecutor charged defendant with crimes related to Richardson's death, and the jury found defendant guilty. This appeal followed.

## II. EXPERT WITNESS

In both his brief on appeal and Standard 4 brief,[2] defendant argues that the trial court erred when it refused to authorize his request for funds to consult with an expert about defendant's mental health. He also claims that the trial court erred when it precluded him from presenting expert testimony at trial concerning his mental health for a purpose other than to establish legal insanity. We disagree.

## A. PRESERVATION AND STANDARDS OF REVIEW

Although defendant requested funds in the trial court, he asserted that he needed an expert to evaluate whether he might be insane or guilty but mentally ill. He did not assert that the expert testimony might be relevant to something other than whether he was insane or guilty but mentally ill. Because he did not assert that alternate ground for an expert before the trial court, that claim of error is unpreserved. See *People v Clark*, 330 Mich App 392, 414; 948 NW2d 604 (2019). Defendant further argues that, to the extent that his claims regarding an expert were unpreserved, defense counsel provided ineffective assistance by failing to preserve the claims.

---

[1] Defendant was charged and convicted of first-degree premeditated murder, carrying a concealed weapon, MCL 750.227, and felony-firearm for the death of Graciela. See *People v Patten*, unpublished per curiam opinion of the Court of Appeals, issued November 19, 2019 (Docket No. 343798).

[2] See Administrative Order 2004-6, Standard 4, 471 Mich c, cii (2004).

This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes and court rules, *People v Comer*, 500 Mich 278, 287; 901 NW2d 553 (2017), questions of constitutional law, *People v Kennedy*, 502 Mich 206, 213; 917 NW2d 355 (2018), and whether defense counsel's acts or omissions "fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial," *People v Gioglio (On Remand)*, 296 Mich App 12, 19-20; 815 NW2d 589 (2012), remanded for resentencing 493 Mich 864 (2012). To the extent that defendant has not preserved his claim of error for appellate review, this Court must review his claim under the plain error standard. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To establish plain error, defendant must show that the trial court committed a plain or obvious error and that the error affected the outcome of the lower court proceeding. *Id.*

## B. ANALYSIS

The Michigan Legislature enacted statutory provisions governing whether a defendant may assert the affirmative defense of insanity, the manner in which the jury should consider the defense, and the effect of a verdict of guilty but mentally ill, as opposed to a verdict of not guilty by reason of insanity. The Legislature stated that insanity is an affirmative defense to a criminal prosecution when, as a result of a mental illness or intellectual disability, the defendant lacked "substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law." MCL 768.21a(1). In order to present an insanity defense, the defendant must provide timely notice that he intends to do so and must undergo a competency examination. See MCL 768.20a. The Legislature prohibited a defendant from presenting evidence to establish his or her insanity if the defendant failed to comply with the notice requirement stated in MCL 768.20a. MCL 768.21(1).

The Legislature also enacted statutes governing how the trial court must instruct the jury on the insanity defense. The Legislature provided that, if a defendant asserted the defense of insanity in compliance with MCL 768.20a, the jury may—as an alternative to finding the defendant not guilty by reason of insanity—find the defendant guilty but mentally ill. MCL 768.36(1). The trial court must instruct the jury on an insanity defense, when "warranted by the evidence," and, in such a case, it must instruct the jury that it should separately consider "the presence or absence of mental illness and the presence or absence of legal insanity." MCL 768.29a(2). The trial court must also instruct the jury on the "verdicts of guilty, guilty but mentally ill, not guilty by reason of insanity, and not guilty with regard to the offense or offenses charged and, as required by law, any lesser included offenses." *Id.*

As the trial court correctly noted, defendant was unable to identify any expert who would testify that defendant met the statutory definition of insanity. In the absence of such evidence, the trial court had no obligation to present the defense of insanity to the jury. See MCL 768.29a(2). Similarly, the Legislature provided that a jury should only be instructed on the verdict of guilty but mentally ill when instructed on the defense of insanity. See MCL 768.36(1); see also *People v Ritsema*, 105 Mich App 602, 612; 307 NW2d 380 (1981) (noting that an instruction on guilty but mentally ill is appropriate only when an instruction on insanity is warranted by the evidence). Accordingly, the trial court did not err when it determined that defendant could not present an insanity defense or present evidence that he suffered from a mental illness that warranted a verdict of guilty but mentally ill because the evidence did not justify the instructions. See

MCL 768.29a(2). Moreover, the trial court's decision to preclude defendant from presenting evidence that he had a mental illness for those purposes did not deprive defendant of his constitutional right to present a defense because he had not met the criteria for presenting the defense. See *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984).

Once the trial court properly determined that defendant could not present an insanity defense at trial, the trial court correctly denied defendant's request for funds beyond that which it had already authorized. Our Supreme Court has acknowledged that a defendant has a due-process right to consult with an expert at public expense. See *Kennedy*, 502 Mich at 213-220 (discussing *Ake v Oklahoma*, 470 US 68; 105 S Ct 1087; 84 L Ed 2d 53 (1985)). Nevertheless, before a trial court would be warranted in providing such funds, the defendant must demonstrate something more than a mere possibility of assistance from an expert—the defendant must show that there is " 'a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.' " See *Kennedy*, 502 Mich at 227-228, quoting *Moore v Kemp*, 809 F2d 702, 712 (CA 11, 1987). In the trial court, defense counsel asserted that she wanted an expert solely to establish that defendant had a mental illness that warranted a verdict of guilty but mentally ill. The trial court, however, determined that defendant could not present such evidence because he had not identified an expert who would testify that he met the statutory definition of insanity and, for that reason, he was not entitled to have the jury consider the verdict of guilty but mentally ill. See MCL 768.36(1). Under these circumstances, the trial court did not err when it denied defendant's request for additional funds because defendant failed to demonstrate that there was a reasonable probability that an expert would be helpful or that the absence of expert testimony on that issue would render his trial fundamentally unfair. See *Kennedy*, 502 Mich at 227-228.

Defendant nevertheless argues that the trial court should have granted his request for funds and allowed an expert to testify on behalf of the defense about defendant's mental illnesses for a purpose other than to establish insanity or guilty but mentally ill. He argues for the first time on appeal that he had the right to present evidence concerning his mental illness to help the jury better understand his actions that day. More specifically, he maintains that an expert's testimony would have been helpful to the jury's determination whether he formed the requisite intent to commit the crimes at issue. Our Supreme Court's decision in *People v Carpenter*, 464 Mich 223; 627 NW2d 276 (2001), however, foreclosed the possibility that defendant could offer such expert testimony.

In *Carpenter*, our Supreme Court considered the continued validity of the diminished capacity defense. *Id*. at 226. It determined that the Legislature's comprehensive scheme regulating the defense of insanity established a bright-line test, which demonstrated that the Legislature intended to preclude any defense premised on a defendant's mental health short of legal insanity. *Id*. at 237-239. The Court explained:

> [T]he Legislature's enactment of a comprehensive statutory scheme concerning defenses based on either mental illness or mental retardation demonstrates the Legislature's intent to preclude the use of *any* evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent. [*Id*. at 236.]

The Court further held that the Legislature's policy choice did not violate a defendant's due process right to present a defense because the Constitution did not compel the states to recognize a doctrine of diminished capacity and the states could constitutionally preclude defendants from presenting evidence of mental or psychological deficiencies to challenge the elements of a crime. *Id*. at 240-241. Thus, once the trial court properly determined that defendant could not assert an insanity defense at trial, defendant was also precluded from presenting expert testimony that he lacked mental capacity short of legal insanity to avoid or reduce his criminal culpability by negating the specific intent that the prosecution had to prove for each crime. See *id*. at 236.

On appeal, defendant suggests that the decision in *Carpenter* only precludes evidence that the defendant was *incapable* of forming the requisite intent as a result of mental illness, but does not prevent a defendant from presenting evidence that, although capable of forming the requisite intent, his or her mental illness made it less likely that he or she actually formed that intent. The Supreme Court, however, made it clear in *Carpenter* that defendant's suggestion was not a valid distinction because the Legislative scheme established an "all or nothing insanity defense." *Id*. at 237. It further held that a defendant who does not meet the criteria for legal insanity is precluded from presenting "*any* evidence" that he had a "mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent." *Id.* at 236. Defendant's proposed expert testimony plainly involves testimony that would negate the intent element for the crimes at issue in order to avoid or reduce his criminal responsibility. See *People v Herndon*, 246 Mich App 371, 386; 633 NW2d 376 (2001) (discussing the intents that must be proved to establish that a person committed first-degree murder or second-degree murder).[3] Defendant even states as much on appeal when he opines that the jury would likely have found him guilty of a lesser form of homicide had it heard testimony about his mental illnesses. But that is precisely the type of diminished capacity evidence that *Carpenter* precludes.

Defendant similarly argues that this Court recognized that a defendant may properly present evidence concerning a defendant's mental health for a purpose other than to establish legal insanity in *People v Yost*, 278 Mich App 341; 749 NW2d 753 (2008). In *Yost*, this Court recognized the holding in *Carpenter*, but nevertheless noted that *Carpenter* did not preclude the admission of evidence concerning a defendant's mental health to the extent that the evidence was offered for a relevant purpose other than to negate the intent element of the charged crimes. *Id*. at 354-355. The Court gave examples when evidence of a defendant's mental health might be relevant and admissible for a purpose other than to negate the specific intent of a crime, such as negating the element of identity, demonstrating consciousness of guilt, or showing that the defendant was manipulated into making statements that appeared incriminating. *Id*. at 356-357. The Court, however, reiterated that the evidence must be offered for a relevant purpose other than to negate intent. *Id*. at 357-360.

In this case, defendant did not and has not identified any relevant purpose for the proposed testimony, other than to challenge the intent element of the crimes at issue. Under the decisions in *Carpenter* and *Yost*, he would be precluded from offering such testimony. Accordingly, the

---

[3] Even before our Supreme Court abolished the defense, diminished capacity was not a defense to a general intent crime. See *People v Biggs*, 202 Mich App 450, 454; 509 NW2d 803 (1993).

trial court did not plainly err by failing to authorize funds to hire an expert to provide inadmissible testimony. See *Kennedy*, 502 Mich at 227-228. Defendant also has not stated how consulting with an expert might have otherwise benefited the defense. Consequently, he has not identified a plain or obvious error, let alone a plain or obvious error that prejudiced his trial. See *Carines*, 460 Mich at 763.

Similarly, defense counsel cannot be faulted for failing to raise a meritless ground for procuring an expert or for failing to secure an expert to provide inadmissible testimony. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## III. JUDICIAL MISCONDUCT

Defendant argues in both his brief on appeal and Standard 4 brief that the trial court engaged in misconduct that pierced the veil of judicial impartiality and prejudiced his trial. We disagree.

## A. PRESERVATION AND STANDARDS OF REVIEW

Because defendant did not object to any of the conduct he now claims to have been misconduct, this issue is unpreserved. See *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). This Court reviews de novo, as a question of constitutional law, whether a trial court's conduct deprived the defendant of a fair trial. See *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). This Court reviews unpreserved claims of error for plain, outcome-determinative error. *Carines*, 460 Mich at 763.

## B. ANALYSIS

A defendant has the right to fair and impartial jury trial; a trial court's misconduct before the jury may deprive the defendant of his right to an impartial jury if the judge's conduct pierces the veil of judicial impartiality. *Stevens*, 498 Mich at 170. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171. The trial judge's alleged errors should not be evaluated in isolation, but instead their cumulative effect must be examined as a whole and in consideration of the totality of the circumstances involved in the case. *Id*. at 171-172.

On appeal, defendant claims generally that the trial court exhibited its bias through its comments, questions, and rulings. Defendant cites the record at numerous points, but he does not identify what about the comment, question, or ruling demonstrated bias. Defendant also does not identify the improper inferences that the jury might have drawn from the trial court's comments, questions, or rulings. By failing to adequately brief these claims of error, defendant abandoned them on appeal. See *Clark*, 330 Mich App at 426. Nevertheless, none of the excerpts show that the trial judge pierced the veil of judicial impartiality.

## 1. VOIR DIRE, JUROR INCIDENT, AND SENTENCING

As an example of the trial court's bias, defendant refers to a point when the trial court expressed frustration with defense counsel at a hearing. The court stated that it was frustrated with the last-minute motion for funds to hire an expert because no one raised the issue earlier. Despite its frustration, the trial court granted an adjournment so defendant could prepare a request for an independent examination and for funds to hire an expert. Viewing the remark in context, this hearing occurred before trial even began—and so could not have pierced the veil of judicial impartiality. Further, the trial court ruled in defendant's favor and admonished defense counsel to do a better job of consulting with defendant. See *Stevens*, 498 Mich at 174. It did not, therefore, amount to misconduct. See *id*. at 171.

Defendant also suggests that the trial court exhibited bias in its handling of voir dire and with an incident involving a juror. But defendant abandoned any claim involving the jury's composition or juror bias by failing to identify any such errors in his statement of the questions presented. *People v Albers*, 258 Mich App 578, 584; 672 NW2d 336 (2003); MCR 7.212(C)(5). He also has not identified the applicable law or stated in any meaningful way how the law applied to his claim. Therefore, he has abandoned any claim that his rights were violated by the composition of the jury. See *Clark*, 330 Mich App at 426. Moreover, the record of these events does not support a claim that the trial court pierced the veil of judicial impartiality during voir dire.

Defendant contends that the trial court was too solicitous regarding any conflicts the potential jurors may have had with the trial schedule. In defendant's view, the trial court's generosity in excusing jurors for cause affected the composition of the jury. But the trial court's concern for the prospective jurors did not demonstrate a bias of any kind, and did not pierce the veil of judicial impartiality. See *Stevens*, 498 Mich at 171. If anything, the trial court's concerns ensured that defendant had a jury that was fully committed to the process and capable of serving without distractions, which made it more likely that he had a fair and impartial jury.

Defendant also complains about the trial court's handling of a juror incident at the start of the third day of trial. The trial court learned that a juror had been seen leaving the courthouse while holding hands with a woman who had sat through trial. The trial court brought the juror into chambers and questioned him. The juror indicated that the person with whom he was holding hands was his wife, who was retired and had come to watch the trial out of curiosity. The juror denied that he spoke with his wife about the trial and stated that he was taking his obligations "very seriously" and was "honored to be chosen" as a juror. The juror agreed that he had not and would not discuss the case with anyone. The trial court determined that the juror did not violate the rules and then left the matter to the parties. The parties did not raise any objections.

The trial court again demonstrated its concern with the fairness and impartiality of the jury and took steps to ensure that defendant's jury was not compromised by outside influences. Although defendant opines in his Standard 4 brief that the trial court should have ordered a mistrial or excused the juror, defense counsel did not request that relief or even express any concerns with how the trial court proceeded. And the trial court's handling of the incident did not demonstrate that it held a bias or otherwise pierced the veil of judicial impartiality. See *id*. To the contrary, the trial court demonstrated its commitment to protecting defendant's right to an impartial jury. See *People v Budzyn*, 456 Mich 77, 88-89; 566 NW2d 229 (1997) (discussing juror misconduct

involving outside influences). Defendant has not identified anything about the trial court's handling of the incident that was improper.

Defendant also complains that the trial court empathized with Kaleena at his sentencing and did not offer defendant any advice. He does not, however, explain how the court's comments at sentencing could have pierced the judicial veil before the jury. See *Stevens*, 498 Mich at 171. In any event, the court's comment at sentencing was not improper.

## 2. QUESTIONS AND COMMENTS AT TRIAL

Defendant next asserts that the trial court inappropriately questioned witnesses. It is generally appropriate for the trial court to question witnesses. See *Stevens*, 498 Mich at 173, citing MRE 614(b). However, the trial court should not invade the role of the prosecutor when doing so. *Stevens*, 498 Mich at 184. It should further avoid questions that are intimidating, argumentative, or skeptical. *Id*. at 175. Instead, the trial court should limit itself to clarifying testimony and to questioning witnesses to provide fuller and more exact testimony or to elicit additional relevant information. *Id*. at 173.

Defendant cites numerous examples, but does not discuss the examples or how the questions pierced the veil of judicial impartiality. Instead, he leaves it to this Court to examine the cited pages and determine whether it sees anything improper. Defendant's handling of this issue constitutes an abandonment of his claims premised on these questions. See *Walters v Nadell*, 481 Mich 377, 388; 751 NW2d 431 (2008) (stating that courts are not "the research assistants of the litigants" and that the parties "have a duty to fully present their legal arguments" for resolution). In any event, when examined in context, none of the cited examples amounts to judicial misconduct.

At trial, defense counsel cross-examined Detective Lonnie Palmer at length about an investigation into a report that Richardson had sexually assaulted AP. Detective Palmer stated that the officers discovered that the allegation involved discipline with a belt, not a sexual assault, and that AP denied that Richardson physically disciplined her. After defense counsel's cross-examination, the trial court asked Detective Palmer if defendant had "at any time" stated that his actions were the "result of this alleged abuse." Detective Palmer responded that defendant had not indicated that. The trial court then asked Detective Palmer about Palmer's understanding of the reason that defendant gave for doing what he did.

Reading the court's questions in context, it is evident that the court was clarifying whether defendant had made statements to the detective that might show whether defendant had acted out of some misguided desire to protect his children. Once Detective Palmer stated that defendant had not identified that as a possible motive for the shooting, the trial court expanded its inquiry by asking Detective Palmer what he believed defendant had meant when he stated that he did not intend to kill Richardson, and Detective Palmer answered to the best of his ability. The trial court's questions were not intimidating, argumentative, or skeptical; the questions elicited additional relevant information about Detective Palmer's interview with defendant. See *Stevens*, 498 Mich at 173-175. Additionally, the trial court did not attempt to impeach the witness or cajole a particular answer. See *People v Swilley*, 504 Mich 350, 372, 376; 934 NW2d 771 (2019) (stating

that the trial court should not use its questions to impeach the witness). Accordingly, the questions did not pierce the veil of judicial impartiality. See *Stevens*, 498 Mich at 170-171.

Defendant also complains that the trial court elicited testimony from Detective Joseph Paul that defendant's interview occurred at lunch and defendant contends that the trial court must have done so in order to undermine the evidence that defendant was upset. On cross-examination, Detective Paul testified that he and Detective Palmer interviewed defendant around lunch time, and defense counsel asked Detective Paul whether defendant had told them what had gotten him so upset. Defendant reported he was upset about an incident that occurred with his son a couple of weeks earlier. Defense counsel also asked Detective Paul about what defendant had said about the handgun.

The trial court asked Detective Paul whether the handgun seized after defendant crashed was a registered handgun, and Detective Paul answered that it was not. The trial court also asked whether Patten confirmed that that was the handgun defendant said he used in the shooting. Detective Paul indicated that Patten merely stated that he used a nine-millimeter, high point handgun. The court then indicated that it did not hear what the detective had said about defendant's emotional state during the interview; the court reminded the detective that he had testified that he had just arrived to interview defendant after lunch. The detective described for the jury that defendant appeared depressed at that time.

Nothing about these questions was inappropriate or pierced the veil of judicial impartiality. See *Stevens*, 498 Mich at 170-171. The questions again involved clarifications of testimony and did not suggest that the trial court held any particular beliefs about the events. Further, when read in context, it was evident that the trial court's reference to lunch time was an attempt to remind the detective about his previous testimony, which the trial court had not heard. The detective's answer was consistent with his previous testimony and clarified that defendant was depressed throughout the interview, which helped the jury better understand the circumstances surrounding defendant's interview. The questions did not amount to judicial misconduct. See *id*.

Defendant also suggests that the trial court engaged in misconduct by eliciting additional testimony about the circumstances surrounding defendant's arrest for driving under the influence of alcohol. A review of the transcript shows that the prosecutor and defense counsel did not question Officer Aaron Skibo in a way that allowed the officer to provide a coherent narrative about the events involving defendant's arrest for driving under the influence. It was, for example, at first unclear that defendant got back into his car and drove a short distance before being apprehended. It was also unclear how defendant's car became stuck. The trial court attempted to fill in some of these omissions for the jury. The court's questions helped clarify the timing and showed that defendant drove off after Officer Skibo first encountered him. The questions further helped to clarify that defendant was only apprehended after he got stuck. The questions further showed that Officer Skibo did not notice that defendant had soiled himself until after defendant was pulled from the car. The trial court asked whether the officer found alcohol in the car, but the officer could not recall whether he had. The trial court's questions did not invade the province of the prosecution; rather, they were relevant and helpful to understanding the officer's testimony. As such, the court's questions did not amount to misconduct. See *Stevens*, 498 Mich at 170-171.

## 3. RULINGS

Defendant also argues that the trial court's one-sided rulings demonstrated that it was biased against him, which would have been evident to the jury. He suggests as well that the court's comments during the rulings gave the impression that the court thought defense counsel was dishonest or ignorant of the law.

A trial court's rulings generally do not pierce the veil of judicial impartiality unless the rulings exhibit a deep-seated favoritism or antagonism that demonstrates that the trial court was unable to exercise fair judgment. *People v Willis*, 322 Mich App 579, 590; 914 NW2d 384 (2018).

Defendant complains, for example, about the trial court's handling of defense counsel's objection to an answer that Kaleena gave after defense counsel asked whether Kaleena's children had made "any statements that you know of or that you were present for" to workers from children's protective services. Defense counsel objected because Kaleena indicated that the children had made "numerous statements . . . about [defendant] killing [Richardson]," which defense counsel felt went beyond the scope of her question. Defense counsel's question was poorly worded and invited a longer response, even though it could have been answered with a yes or no. The trial court nevertheless correctly recognized that Kaleena's answer was not wholly unresponsive and, in fact, did not quote any statement by the children to third parties. Moreover, when defense counsel asked the court to instruct Kaleena that she could not state what the children had related to the workers, the court responded, "Okay." It then reminded the witness where she had left off before the objection, and the witness identified the remaining persons to whom the children had made statements. The trial court's ruling was not erroneous, and its response to defense counsel's objection was not impolite, intemperate, or otherwise objectionable. See *Stevens*, 498 Mich at 175 (stating that a trial court should be mindful of the words it uses before the jury and should avoid intimidating, argumentative, or skeptical statements).

The trial court also did not err or express bias when it overruled defense counsel's attempt to stop Kaleena from testifying about the reason that AP gave her for moving in with defendant. Defense counsel asked Kaleena why AP went to live with defendant, which invited Kaleena to respond with her understanding of AP's motivation. When defense counsel objected, the trial court only allowed the testimony to show that Kaleena had been given a reason and how she reacted to that reason, not for the truth of the matter that AP asserted. As such, the trial court's ruling was not erroneous because the testimony was not hearsay. See MRE 801(c). Again, nothing about the exchange suggested that the trial court had any animosity toward defense counsel. See *Stevens*, 498 Mich at 170-171.

Defendant maintains that the trial court did not allow the same latitude with hearsay testimony that favored the defense, but the record does not support that contention. Defendant states that the trial court prevented him from presenting testimony about the content of text messages between Oscar and defendant. The trial court arguably was mistaken when it sustained the prosecution's objection to Hart's testimony about the texts because Hart did not in fact offer to testify about the content of the messages. But the trial court itself elicited testimony from Hart that she was aware of the messages because Oscar actually relayed the messages through her. The court then allowed Hart to testify that Oscar was angry with her because she was dating a white man and allowed her to testify that Oscar accused defendant of being a pedophile. The context

-10-

shows that, even if the trial court prematurely sustained the prosecution's objection, it then provided defense counsel with the opportunity to establish the nature of the messages and to show that Oscar had animosity for defendant. Nothing about the trial court's handling of the objection might have led the jury to believe that the trial court held a bias against the defense. See *id*.

Defendant similarly has not shown that the trial court's handling of Hart's testimony demonstrated deep-seated favoritism or antagonism toward the defense. See *Willis*, 322 Mich App at 590. The trial court responded "sustained" when the prosecution objected after defense counsel asked Hart whether Oscar had ever threatened her. Defense counsel then restated the question in a way that elicited testimony that did not involve hearsay, and Hart related that she never felt threatened to be around Oscar's family before the incident. Nothing about this exchange hinted at judicial misconduct that might have pierced the veil of judicial impartiality. See *Stevens*, 498 Mich at 170-171.

The trial court's decision to allow the prosecutor to ask AP to relate Hart's statements to her after defendant left the home also did not amount to judicial misconduct. The trial court allowed the testimony and instructed the jury that it could not use the statements as evidence of "what actually happened"; instead, it told the jury that it could only use the testimony to "explain what the witness did after she heard the statement." AP then told the jury that Hart asked to speak with her and told her that defendant left with a gun. AP stated that she twice tried to get Hart to call the police department, but Hart refused. AP's request to call the police department would have made no sense had the jury not learned that AP was concerned because she had been told that defendant left with a gun. Under the circumstances, the trial court's decision to allow the testimony to show its effect on the listener was not error, see MRE 801(c); *People v Chambers*, 277 Mich App 1, 10-11; 742 NW2d 610 (2007) (stating that the use of hearsay testimony to prove something other than the truth of the matter is not unconstitutional), and nothing else about the exchange suggests judicial misconduct, see *Stevens*, 498 Mich at 170-171.

The trial court also did not err when it determined that the nature of Hart's relationship with Oscar was not relevant. As the trial court noted, defendant was not on trial for the shooting of Graciela—that shooting was only relevant to establish the timeline and defendant's intent on the night at issue. After defense counsel elicited testimony from Hart that she had obtained a restraining order against Oscar, the trial court sustained the prosecution's objection and instructed the jury that Oscar's character was not on trial and that it should "take nothing from that" testimony. Again, the trial court's ruling and instruction were correct, see MRE 401; MRE 402, and nothing about the exchange suggested that the trial court was deliberately undermining the defense or otherwise pierced the veil of judicial impartiality, see *Stevens*, 498 Mich at 170-171.

Defendant complains as well that the trial court showed its bias by allowing Officer Skibo to speculate about how defendant's tires came to be punctured, and when it sustained an objection to defense counsel's closing argument suggesting that defendant's gun may have had a light trigger and may have gone off accidentally. These rulings too were not error and did not involve any intemperate or improper comments by the court. The trial court simply articulated its rulings and gave an appropriate instruction in the latter case. There was no misconduct, see *Stevens*, 498 Mich at 170-171, and the rulings did not suggest that the trial court held a deep-seated antagonism against the defense, see *Willis*, 322 Mich App at 590.

Defendant asserts that the trial court's rulings outside the presence of the jury were also indicative of bias. Outside the presence of the jury, defense counsel indicated that she wanted to call retired officer Jeffrey Johnson to impeach AP and to establish that there was abuse. The trial court indicated that it might be hard to get him to testify given that he was in Florida, and asserted that, even if he were available to testify by phone, his testimony might not be relevant. The court explained that the allegations of abuse approximately two months before the shooting did not constitute a defense because defendant could have called the police department or child protective services; defendant did not have the right to assault Richardson with a weapon.

Although the trial court was skeptical about the officer's testimony, it did not preclude the defense from calling him, and nothing about the trial court's exchange indicated a bias. Notably, this exchange occurred outside the presence of the jury and, therefore, the jury could not have been influenced by the court's comments. See *Stevens*, 498 Mich at 170-178.

The same is true of the court's discussion concerning the text messages that the defense attempted to admit through Hart on the last day of trial. The text messages were between Kaleena and Hart on June 10, more than a month before the shooting. Outside the presence of the jury, the trial court asked defense counsel what she hoped to show with the texts. Counsel replied that the texts would confirm Kaleena had the conversations with Hart. The court noted that Kaleena had already testified as much; she testified that she warned Hart about defendant's anger issues. The court then read the exhibit into the record[4] before stating that it would not allow them into evidence. The court stated, in relevant part, that the exhibit was cumulative to Kaleena's testimony and likely being offered to show that defendant had mental health problems, which would confuse the jury because his mental state at the time of the shooting did not meet the criteria for insanity. The court indicated that it would still allow the defense to discuss with Hart what she knew, but it was not going to allow the texts to bolster an inadmissible defense.

Nothing about this exchange was inappropriate. The trial court's comments were relevant to the discussion over the proposed exhibit and did not indicate bias. See *Stevens*, 498 Mich at 170-171. The trial court appropriately made a record to preserve the issue and explained its decision, which was correct and is not challenged on appeal by defendant. See *Yost*, 278 Mich App at 354-355; MRE 403. This exchange did not pierce the veil of judicial impartiality. See *Stevens*, 498 Mich at 170-171.

Defendant next asserts that the trial court's self-defense comment was evidence of bias against the defense. Just before the comment at issue, defense counsel examined Kaleena and elicited testimony that Richardson was heading toward the home's front door when defendant burst inside. Kaleena agreed that Richardson did not stop heading toward defendant even after he forced the door open. After the trial court excused the jury for lunch, the court admonished defense counsel that she could not argue self-defense on behalf of her client because that would not be a valid defense under the circumstances. The trial court's ruling was correct, see *People v Guajardo*, 300 Mich App 26, 34-35; 832 NW2d 409 (2013) (stating that a defendant may not assert self-defense when he was the initial aggressor), and it was entirely appropriate to warn defense counsel

---

[4] Kaleena wrote that she knew that defendant was hospitalized for his anger once when he was 16 or 17.

to avoid making an improper argument when the jury returned, see MRE 611(a) (authorizing the trial court over the mode and order of presenting evidence). There was nothing about the exchange that suggested judicial misconduct. See *Stevens*, 498 Mich at 170-171.

Defendant also contends that the trial court expressed its belief that defendant shot Richardson because defendant was drunk. Defendant does not identify where in the record the trial court informed the jury of that belief. Instead, he cites the trial court's two instructions to the jury that voluntary intoxication was not a defense. But the circumstances of that initial exchange do not establish that the trial court's comments expressed to the jury that the trial court believed that defendant was drunk.[5] Detective Paul testified that defendant admitted that he drank two 22-ounce beers before the shooting and more alcohol after the shooting. Defense counsel also asked Detective Paul whether defendant had said that he blacked out at any point. Detective Paul responded that the only comments defendant made that would fit that description occurred just before his crash in Indiana. After Detective Paul's testimony, the jury had three questions, including whether defendant told Detective Paul anything that suggested defendant was "aware that he had shot somebody" before driving to St. Joseph County. Detective Paul replied that he did not remember. The trial court instructed the jury that voluntary intoxication was not a defense to the charges in this case.

A trial court has a duty to "instruct the jury as to the law applicable to the case." MCL 768.29. Except in one narrow circumstance, not applicable here, voluntary intoxication is not a defense. *People v Maynor*, 470 Mich 289, 297; 683 NW2d 565 (2004). Given the jury's question, it was appropriate for the trial court to instruct the jury on voluntary intoxication. MCL 768.29. There was also no indication in the record that the trial court's instruction conveyed to the jury that the trial court had any beliefs about the evidence. There was nothing inappropriate about the trial court's instruction. See *Stevens*, 498 Mich at 170-171.

In his Standard 4 brief, defendant further argues that defense counsel should have objected to the trial court's misconduct at trial. However, because the trial court's questions, comments, and rulings did not amount to judicial misconduct, defense counsel had no obligation to object to the court's questions, rulings, and comments on the ground that they pierced the veil of judicial impartiality. See *Ericksen*, 288 Mich App at 201.

To the extent that any of the trial court's comments, rulings, or questions could be said to have adversely influenced the jury in some minor way, they did not prejudice defendant's trial. In the opening and closing instructions, the court instructed the jury that the jury must decide the case on the evidence alone. It also instructed the jury that that the court's "comments, rulings, questions and instructions" were not evidence, and stated that it was "not trying to influence your vote or express a personal opinion about the case" through its comments, rulings, questions, or instructions. It further instructed the jury that, even if the jury concluded that the court had an opinion about the case, it should "pay no attention to that opinion." It reiterated that the jury alone was the judge of the facts and that it must decide the case on the basis of the evidence. The jury is presumed to have followed the trial court's instructions. *People v Matuszak*, 263 Mich App 42, 58; 687 NW2d 342 (2004). Further, these instructions cured whatever minor prejudice might have

---

[5] The court's second instruction was given before the jury deliberated.

been occasioned by the court's comments, rulings, and questions. See *Willis*, 322 Mich App at 592-593.

## IV. PROSECUTORIAL MISCONDUCT[6]

In his Standard 4 brief, defendant argues that the prosecution engaged in misconduct that deprived him of a fair trial. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

Defendant failed to preserve any of these claims by not objecting in the trial court. See *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). This Court reviews unpreserved claims of prosecutorial misconduct for plain error affecting the defendant's substantial rights. *Carines*, 460 Mich at 763. "[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007).

### B. ANALYSIS

Defendant first argues that the prosecutor engaged in misconduct by intimidating him with bribes and threats, influencing his decision not to testify at trial. The record suggests that the prosecution made a plea offer to defendant and the record reflects that defendant countered with an offer to plead to second-degree murder—an offer the prosecution rejected the day before trial. The next morning, defendant alleges that he met with his attorney off the record. According to defendant, counsel advised him that the prosecutor's offer of a plea to felony-murder remained open. Counsel further shared that "they have a lot of pull in" the Department of Corrections and could make defendant's stay "more pleasant" with amenities like video games[7] or "uncomfortable" by sending him to the Upper Peninsula and limiting his visits.[8] Defendant continued to trial.

On the third day of trial, defense counsel informed the court that defendant was "claiming that the prosecutor was trying to bribe him with an offer or threaten him with a bad letter or a good letter to the Department of Corrections." The court asked that defendant's allegation be addressed

---

[6] This Court has explained that a fairer label for most claims of prosecutorial misconduct would be "prosecutorial error," while only the most extreme cases rise to the level of "prosecutorial misconduct." *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). To the extent we use the phrase "prosecutorial misconduct," it is as a term of art.

[7] By way of example, defense counsel referred to Douglas Stewart, who was provided an X-box in exchange for revealing the location of his missing wife's body, after being convicted of her murder.

[8] When this trial began, defendant had already been sentenced to life without the possibility of parole for murdering Graciela. See footnote 1.

at the close of the prosecution's case; however, no further on-the-record discussion occurred.[9] Instead, defendant called witnesses in his defense, and, after consultation, defense counsel informed the court that defendant did not wish to testify.[10] Now, however, defendant contends that his recollection of the prosecutor's pre-trial "intimidation" "impacted" his decision not to testify at trial.

A defendant has the right to call witnesses on his behalf under the compulsory process and due process clauses of the federal and state constitutions. US Const, Am V, VI, and XIV; Mich Const 1963, art 1, §§ 17 and 20. The Sixth Amendment guarantees an accused the right to call witnesses "material and favorable to his defense." *Rock v Arkansas*, 483 US 44, 52; 107 S Ct 2704; 97 L Ed 2d 37 (1987), quoting *United States v Valenzuela-Bernal*, 458 US 858, 867; 102 S Ct 3440; 73 L Ed 2d 1193 (1982). Materiality requires a showing that " ' the suppressed evidence might have affected the outcome of the trial.' " *Valenzuela-Bernal*, 458 US at 868 (quoting *United States v Agurs*, 427 US 94, 104; 96 S Ct 2392; 49 L Ed 2d 342 (1976). As defendant contends, "[l]ogically included in the accused's right to call" material and favorable witnesses, "is a right to testify himself, should he decide it is in his favor to do so." *Rock*, 483 US at 52. Prosecutorial threats or intimidation that dissuade a potential defense witness from testifying violate due process. *Pyle v Kansas*, 317 US 213, 214, 216; 63 S Ct 177; 87 L Ed 214 (1942) (the petitioner adequately alleged a constitutional violation, claiming that the prosecution knowingly presented perjured testimony and threatened and intimidated potential defense witnesses to suppress their testimony); *People v Hill*, 257 Mich App 126, 135; 667 NW2d 78 (2008) ("Attempts by the prosecution to intimidate witnesses from testifying, if successful, amount to a denial of" due process.). Cases finding that the prosecutor improperly intimidated a witness typically involve the threat of bringing criminal charges against the potential defense witness or otherwise punishing him or her so that he or she declines to testify. See e.g., *People v Pena*, 383 Mich 402; 175 NW2d 767 (1970) (assistant prosecutor sent an official letter to the defendant's proposed alibi witnesses informing them that the penalty for perjury was life imprisonment); *People v Williams*, 45 Mich App 623, 625-627; 207 NW2d 176 (1973) (prosecutor told a potential defense witness that she had a right against self-incrimination and that he would prosecute her for carrying a concealed weapon or perjury if she testified).

In this case, assuming arguendo that defense counsel conveyed to defendant the prosecutor's ability to send a favorable or unfavorable letter to the Department of Corrections, this alleged "intimidation" occurred in the context of a plea offer that defendant *rejected* and had his attorney place on the record. Although defendant now contends this "intimidation" "impacted" his decision to testify, the record reflects that, after consultation with counsel, defendant simply opted not to testify. Indeed, defendant never details the favorable and material evidence he would have presented. Because defendant has not demonstrated that the prosecution engaged in misconduct, much less that the misconduct resulted in a miscarriage of justice, his claim fails. See

_____

[9] Defendant filed a motion to remand, requesting an evidentiary hearing regarding his allegations, which this Court denied. *People v Patten*, unpublished order of the Court of Appeals, entered August 31, 2020 (Docket No. 349597).

[10] Defendant's name was not included on his witness list for this trial and defendant did not testify during his earlier murder trial in Kalamazoo County. *Patten*, unpub op at 8.

-15-

*People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008) (stating that the defendant bears the burden of establishing that the prosecutor's misconduct resulted in a miscarriage of justice).

Defendant also argues that the prosecutor committed misconduct by reading the law to the jurors. Specifically, he maintains that the prosecutor restated jury instructions in his opening and closing statements and described the evidence that he believed would or did establish the elements. While a prosecutor may not read the law to the jury, *People v Holmes*, 2 Mich App 283, 286-287; 139 NW2d 771 (1966), "[t]he prosecutor is free to argue the evidence and all reasonable inferences from the evidence as it relates to his theory of the case," *People v Gonzalez*, 178 Mich App 526, 535; 444 NW2d 228 (1989). Despite defendant's characterization, the prosecutor only argued that the evidence would show beyond a reasonable doubt that defendant committed each element of each offense, which he connected to the instructions on the elements; there was nothing improper about the prosecutor's effort to connect the facts that would be proved to the elements of the offenses. See *Ericksen*, 288 Mich App at 200 ("Opening statement is the appropriate time to state the facts that will be proved at trial."). Defendant similarly complains that the prosecutor informed the jury about the manner in which he would convict defendant. But the prosecutor had the right to relate his belief that the evidence would show that defendant was guilty and to argue that he should be convicted. See *People v Humphreys*, 24 Mich App 411, 414; 180 NW2d 411 (1970) ("Although the prosecutor is free in final argument to relate the facts to his theory of the case, and in so doing say that certain evidence leads him to believe the defendants is guilty, he may not express a belief in the defendant's guilt without relating the belief to the evidence.") (citations omitted).

The prosecutor also correctly used his closing arguments to argue his theories of the law to the jury and to state how he believed the evidence established each element of each offense. See *People v Finley*, 161 Mich App 1, 9; 410 NW2d 282 (1987) ("The purpose of closing argument is to allow attorneys to comment on the evidence and to argue their theories of the law to the jury."). In a short statement to the jury, the prosecutor identified the evidence that he believed supported each element of each offense. There was nothing improper about the prosecutor's closing statement.

Defendant next argues that the prosecutor committed misconduct that deprived him of a fair trial when he told the jury that he believed that the evidence showed that defendant was not just trying to scare Richardson: "This was a night of deliberate acts by a very cruel, evil person who murdered two people." In defendant's view, this comment was intended to inflame the jury's passions.

A prosecutor may not attempt to obtain a conviction by inflaming the jury's passions or asking the jury to suspend their judgment and decide the case on an improper basis. See *People v Bahoda*, 448 Mich 261, 266; 531 NW2d 659 (1995). The prosecutor may, however, argue the evidence. *Id*. at 282. The prosecutor's comment—although using strong language—for the most part amounted to an argument concerning the evidence. See, e.g., *People v Hoffman*, 205 Mich App 1, 21; 518 NW2d 817 (1994). There was strong evidence that defendant left his home on the night at issue and hunted down two of his romantic rivals. In doing so, he shot and killed an innocent bystander and then murdered his other romantic rival in cold blood; moreover, he did so in front of his ex-wife and his children. Relying on that evidence, the prosecutor could properly argue that the evidence showed that defendant acted with deliberation and that the circumstances

-16-

surrounding his acts showed that the acts were that of a cruel man. See *id*. See also *People v Ullah*, 216 Mich App 669, 678-679; 550 NW2d 568 (1996) (recognizing that prosecutors may use hard and emotional language in their closing arguments). The only characterization that might have gone too far was the comment that defendant was evil. However, that remark was not so prejudicial that it might have influenced the jury to suspend its judgment. Indeed, any potential prejudice could easily have been cured by an instruction. Therefore, even if improper, the remark does not constitute misconduct that warrants a new trial. See *Ullah*, 216 Mich App at 679 (stating that this Court will not grant relief for an improper comment when the prejudice caused by the comment could have been cured with a curative instruction).

Defendant next implies that the prosecutor did something improper when he suggested that the instruction concerning whether a witness had been threatened or promised anything would not be applicable to the witnesses in this case. In arguing his theories, the prosecutor had leeway to argue the evidence and all reasonable inferences arising from it as they related to his theory of the case. See *Bahoda*, 448 Mich at 282. There was no evidence that any of the witnesses had been promised anything or threatened. As such, the prosecutor could argue that this was not a factor that the jury had to consider when evaluating the evidence. See *id*.

Defendant also argues that the prosecutor committed misconduct by asking witnesses questions that made defendant look bad. Defendant cites portions of the transcript where the prosecutor asked witnesses about their relationship with defendant. A prosecutor does not commit misconduct by seeking in good faith to admit evidence. See *Dobek*, 274 Mich App at 76. The testimony about the relationships between the persons involved in the events at issue was relevant and admissible to show how they knew each other, how they interacted, and to show motive, among other things. See MRE 401; MRE 402. The record does not show that any of the prosecutor's questions were made in a bad faith attempt to elicit inadmissible testimony; defendant has not shown that the prosecutor deprived him of a fair trial through improper questioning. See *Dobek*, 274 Mich App at 76.

## V. VOLUNTARY MANSLAUGHTER

In his Standard 4 brief, defendant asserts that the trial court erred when it denied his request to have the jury instructed on voluntary manslaughter. We disagree.

### A. STANDARD OF REVIEW

This Court reviews de novo whether the trial court properly instructed the jury. *People v Martin*, 271 Mich App 280, 337; 721 NW2d 815 (2006).

### B. ANALYSIS

A defendant is entitled to have the jury instructed on a necessarily included lesser offense of a charged offense if a rational view of the evidence would support such an instruction. *People v Mendoza*, 468 Mich 527, 533; 664 NW2d 685 (2003). Voluntary manslaughter is a necessarily included lesser offense of murder. *Id*. at 541. Accordingly, the trial court had an obligation to instruct the jury on that offense if a rational view of the evidence supported it. *Id*. at 533.

Voluntary manslaughter is the intentional killing of another while under the influence of passion produced by an adequate provocation. *Id*. at 535. Whether a particular provocation was adequate depends on a reasonable person standard: the provocation necessary to mitigate a homicide from murder to voluntary manslaughter is that which would cause a reasonable person to lose control and act out of passion rather than reason. See *People v Roper*, 286 Mich App 77, 87; 777 NW2d 483 (2009). Additionally, there must have been no lapse of time within which a reasonable person would have controlled his passions. *Id*.

On appeal, defendant maintains that there was evidence of adequate provocation and that not enough time passed from the time that he was provoked to the time that he killed Richardson for a reasonable person to control his passions. Defendant first points to evidence that he learned that Richardson had struck his son. Assuming that a reasonable person would lose control and fly into a homicidal rage if he heard that someone struck his child, the evidence showed that the alleged incident involving defendant's son occurred "a couple weeks" before the shooting. No reasonable jury could find that a couple of weeks was insufficient time for a reasonable person to recover their senses and begin to function rationally. See *People v Pouncey*, 437 Mich 382, 392; 471 NW2d 346 (1991) (stating that a trial court properly refuses to instruct the jury on voluntary manslaughter when the evidence would not support a finding that there was adequate provocation).

Defendant also claims that he suffered adequate provocation when he first arrived at Richardson's home. He asserts that Kaleena provoked him by shutting the door to the home and locking it after defendant demanded to see Kaleena's husband. But Kaleena's response was entirely reasonable and—as a matter of law—cannot be said to be the kind of provocation that would not have caused a reasonable person to suddenly lose control of his faculties. As our Supreme Court has stated, the law does not "countenance the loss of self-control"; for that reason, "[n]ot every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter." *Id*. at 389.

There was no evidence to support a voluntary manslaughter instruction. Therefore, the trial court did not err when it refused to give the instruction. See *id*. at 392.

## VI. DOUBLE JEOPARDY

Finally, defendant argues that his sentences violate the prohibition against double jeopardy. We agree that a ministerial correction to defendant's judgment of sentence is warranted, but disagree that defendant's first-degree felony murder and first-degree home invasion were the same offense for purposes of double jeopardy.

### A. PRESERVATION AND STANDARD OF REVIEW

These claims are unpreserved because defendant did not raise them before the trial court. See *People v Bass*, 317 Mich App 241, 272; 893 NW2d 140 (2016). This Court reviews unpreserved claims of constitutional error for plain, outcome-determinative error. See *Carines*, 460 Mich at 763.

## B. ANALYSIS

The Constitutions of the United States and Michigan both prohibit a person from being twice put in jeopardy for the same offense. See US Const, Am V; Const 1963, art 1, § 15. The double-jeopardy prohibition, in relevant part, precludes a person from being punished multiple times for the same offense. *People v Ream*, 481 Mich 223, 227; 750 NW2d 536 (2008). The jury found defendant guilty of first-degree premeditated murder and first-degree felony murder involving the death of the same victim, which amounts to multiple punishments for the same offense. *People v Long*, 246 Mich App 582, 588; 633 NW2d 843 (2001). Accordingly, we remand this case to the trial court for the ministerial task of correcting the judgment of sentence to reflect that defendant's single first-degree murder conviction is supported by two theories: premeditated murder and felony murder. *Id*.

Defendant also complains that his sentence for first-degree home invasion violates double jeopardy because it constitutes the same offense as first-degree felony murder given that it was the predicate felony for the felony-murder conviction.[11] A sentence does not violate the multiple punishments prohibition of double jeopardy if the Legislature specifically authorized multiple punishments. *People v Miller*, 498 Mich 13, 18; 869 NW2d 204 (2015). This case involves the home invasion statute, including MCL 750.110a(9), which provides that "[i]mposition of a penalty under this section does not bar imposition of a penalty under any other applicable law." Thus, the Legislature clearly intended to permit multiple punishments when both the home invasion statute and another statute could apply to the same criminal conduct. *People v Conley*, 270 Mich App 301, 311-312; 715 NW2d 377 (2006). Because the Legislature explicitly intended to permit convictions of home invasion and any other crime, such as first-degree murder, defendant's convictions did not violate his constitutional protection against double jeopardy.[12]

---

[11] On appeal, defendant relies on the decision in *People v Wilder*, 411 Mich 348; 308 NW2d 112 (1981), for the proposition that one cannot be sentenced for both felony murder and the underlying predicate felony. However, our Supreme Court specifically overruled *Wilder* in *Ream*. See *Ream*, 481 Mich at 241. Therefore, the trial court did not plainly err when it sentenced defendant for both felony murder and the underlying predicate felony of first-degree home invasion. See *Carines*, 460 Mich at 763.

[12] Even if the Legislature had not so clearly stated that multiple punishments were permitted, the outcome would not change as the proper test for determining whether two offenses constitute the same offense for purposes of double jeopardy is the same-elements test. *Miller*, 498 Mich at 18, citing *Ream*, 481 Mich at 238. That test examines the abstract legal elements of the offenses at issue. *Ream*, 481 Mich at 239. If one offense requires proof of a fact that the other does not, they are not the same offenses and the defendant may properly be convicted of both offenses. *Id*. at 227-228. "This means that, under the *Ream* test, two offenses will only be considered the 'same offense' where it is impossible to commit the greater offense without also committing the lesser offense." *Miller*, 498 Mich at 19.

A defendant commits felony murder when he commits murder during the perpetration or attempt to perpetrate certain enumerated offenses, which includes first-degree home invasion. See

-19-

## VII.  CONCLUSION

Defendant has not identified any errors that warrant a new trial.  Accordingly, we affirm his convictions.  But we remand this case to the trial court for the ministerial task of modifying the judgment of sentence to reflect that defendant was convicted of one count of first-degree murder supported by two theories.

Affirmed, but remanded for amendment of the judgment of sentence consistent with this opinion.  We do not retain jurisdiction.

/s/ Karen M. Fort Hood
/s/ Michael F. Gadola
/s/ Anica Letica

---

MCL 750.316(1)(b).  Because one can commit felony murder by committing any one of the enumerated offenses, a person charged with felony murder arising from an armed robbery can properly be convicted of both felony murder and armed robbery; this is so, because felony murder contains an element—the commission of an enumerated offense—that is not an element of armed robbery.  See *Ream*, 481 Mich at 241.  Similarly, the elements of first-degree home invasion do not include that element.  See *People v Wilder*, 485 Mich 35, 42; 780 NW2d 265 (2010) (stating the elements of first-degree home invasion).  Because a person can commit felony murder without committing first-degree home invasion, they are not the same offenses under the same-elements test.  See *Ream*, 481 Mich at 241.